IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

ALVIN LEWIS LUCAS,

                Plaintiff,

    v.

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,[1]

                Defendant.

CIVIL ACTION FILE NO.

1:15-CV-2936-JFK

## FINAL OPINION & ORDER

Plaintiff in the above-styled case brings this action pursuant to § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to obtain judicial review of the final decision of the Commissioner of the Social Security Administration which denied his application for disability insurance benefits.  For the reasons set forth below, the court **ORDERS** that the Commissioner's decision be **AFFIRMED**.

### I.      Background & Procedural History

The Plaintiff-Claimant, Alvin Lewis Lucas, born January 29, 1963, seeks disability insurance benefits and supplemental security income based upon a

---

[1]Carolyn W. Colvin became Acting Commissioner of Social Security on February 14, 2013.

combination of physical and mental impairments, including schizoaffective disorder, depression, and arthritis of the spine.  [Doc. 10 at 2; Record ("R.") 146].

The claimant filed an application for supplemental security income on December 12, 2011, alleging that he became disabled on February 22, 2005.  [R. 116, 272–77, 315].  After his application was denied initially and on reconsideration, an administrative hearing was held on November 22, 2013.  [R. 116, 135–54].  The Administrative Law Judge ("ALJ") issued a decision denying Plaintiff's application on February 28, 2014, and the Appeals Council denied Plaintiff's request for review on July 16, 2015.  [R. 1–7, 116–30].  Plaintiff filed his complaint in this court on August 21, 2015, seeking judicial review of the Commissioner's final decision.  [Doc. 3].  The parties have consented to proceed before the undersigned Magistrate Judge.

The ALJ found that Plaintiff suffers from schizoaffective disorder, cognitive disorder, antisocial personality disorder, arthritis, hypertension, and obesity.  [R. 118]. These impairments are "severe" within the meaning of the Social Security regulations. [R. 118].  However, the ALJ found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  [R. 118–20].  The ALJ found that Plaintiff had no past relevant work.  [R. 128].  However, the ALJ found that there are other jobs that exist in significant numbers in the national economy that

Plaintiff can perform.  [R. 128–29].  As a result, the ALJ concluded that Plaintiff had not been under a disability from December 12, 2011, the date claimant's application for benefits was filed, through the date of the ALJ's decision.  [R. 129].

The decision of the ALJ [R. 120–29] states the relevant facts of this case as modified herein as follows:

The claimant's allegations as presented in his testimony are that he is 50 years old and that he completed the seventh grade.  He had been self-employed mowing lawns during 2005, 2006, and 2008, and he was laid off by a warehouse.  He cannot work because he has back problems for which he takes medication, requiring him to use a cane, and he cannot sleep.  The claimant also hears voices and sees things that are not there.  His medications make him dizzy, and he is unable to focus.  His diagnoses are bipolar disorder and schizophrenia.

The claimant further alleged that he lies down and elevates his legs to his chest daily and that he sleeps most of the day when at home.[2]  His daughter helps him clean the house.  Each day, the claimant needs to go to Park Place, his local mental health center, to talk to someone about his emotions. While medications help him, he has

---

[2] As of November 22, 2013, Mr. Lucas was living in a program facility designed to house mental health patients, veterans, and the like ("Quest in Atlanta"), that his doctor helped him locate and secure.  [R. 147].  There are references throughout the medical record indicating that Mr. Lucas lived at various shelters after his release from prison.

3

crying spells, anger, and suicidal thoughts. When he runs out of medication, he panics. Working would probably make the claimant angry, as he is unable to concentrate. His robbery conviction was unjust, as he was not at the place being robbed.

The medical evidence of record shows that the claimant received medical care at Kirby Correctional Facility, starting in August 2008. In 2008 through 2009, the claimant complained of right chest pain or back pain, which was generally determined to be muscular pain (Exhibit B1F at 12–15). In July 2010, the claimant had an episode of foot pain (Exhibit B1F at 10). In October 2010, the claimant was noted to have been issued insoles for his tinea pedis. The claimant weighed 210 pounds at five feet nine inches tall (Exhibit B1F at 9). The claimant was also prescribed medication for hypertension (Exhibit B1F).

The claimant went to PriMed of Silver Hills on December 31, 2011, complaining of arthritic pain in the right hip, radiating down the leg. A physical examination revealed tenderness in the back and extremities, leading to prescription of pain medication, as well as hypertension medication (Exhibit B2F). On February 7, 2012, the claimant went to Health Services, Inc., complaining of right hip pain. He reported that he had been given Lortab during a recent emergency department visit, which relieved the pain, and he wanted more medication (Exhibit B7F at 2).

On February 21, 2012, Celtin Robertson, M.D. ("Dr. Robertson"), performed a physical consultative examination of the claimant. The claimant complained that he had right hip pain and that he is "useless" from his medication. The claimant reported walking from the Salvation Army to the park, taking several breaks. Plaintiff said that he sat on a park bench all day before returning to the Salvation Army and that he takes out the trash but performs no other chores.

Dr. Robertson weighed the claimant as 238 pounds at five feet seven inches tall. The claimant appeared drowsy, which he attributed to taking antipsychotic medication the previous night, and he also expressed pain in sitting or making any movement on or off the exam table. The claimant had brought a cane, which he obtained from a sister, and he walked with a right antalgic gait. He could not squat or walk on his heels or toes, and there were range of motion limitations. However, strength was full and straight leg raising test was normal. There was tenderness to the right lateral and anterior hip but no redness or warmth. Dr. Robertson concluded that the claimant's pain and range of motion limitations appeared out of proportion with the examination. The diminished severity of symptoms made it difficult to rule out malingering. The claimant's diagnosis was right hip pain (Exhibit B4F).

On April 13, 2012, the claimant returned to Health Service, Inc., where he complained of low back and hip pain since running out of medication three weeks

5

earlier.  The claimant weighed 245 pounds.   Although hypertension was controlled, his medication was changed, and he was also noted to have degenerative joint disease and neuropathy (Exhibit B7F at 1). The claimant went to Grady Health System ("Grady") on October 5, 2012, complaining of moderate low back pain, radiating down his legs.  Claimant reported that his low back pain was due to him falling off a roof five years earlier.  Claimant was told that he had a herniated disc.  The claimant ambulated without assistance and exhibited no tenderness, but he exhibited a decreased range of motion.  The claimant wanted pain medication and a cane, and he was given Motrin (Exhibit B9F at 10 –14).

On November 6, 2012, the claimant reported injuring his back by picking up a trash can two years earlier.   Physical examination showed no radiation of back pain. The claimant was prescribed Tramadol and referred for physical therapy.  The treating physician advised that the claimant would not receive any more pain medication unless claimant attended physical therapy and followed up on obtaining an x-ray (Exhibit B9F at 14–17). The claimant complained of an exacerbation of back pain on November 23, 2012, when he did more chores at his shelter.  He had some tenderness, but a normal range of motion, and he was prescribed Naproxen and Flexeril (Exhibit B9F at 18–22). On November 30, 2012, the claimant complained of chronic back pain, and he was continued on Naprosyn (generic for Naproxen) and Tylenol (Exhibit B9F at 22–24).

The claimant returned to Grady for treatment of low back pain and right foot pain and left foot numbness on December 28, 2012.  The claimant said that previous imaging showed that he had a bulging disc.  The claimant's medications for pain were noted to be Naproxen (Naprosyn), Acetaminophen (Tylenol), Cyclobenzaprine (Flexeril), and Tramadol (Ultram).  Gabapentin was added as a medication to address the claimant's foot numbness (Exhibit B3F at 2–6).  On January 7, 2013, the claimant returned for assessment of physical therapy for back pain.  Plaintiff was noted to have an independent gait and activities of daily living (Exhibit B13F at 6–9).  In February 2013, the claimant's hypertension medication was refilled (Exhibit B13F at 9–12).  In July 2013, the claimant's primary care physician at Grady wrote that the claimant "would benefit from having a cane to help with his gait and lower back pain and stability." (Exhibit B14F at 3–4).

The medical evidence of record shows that the claimant was admitted to a psychiatric hospital for an overdose of medication after his wife died (Exhibit B3F).  After the suicide attempt, the claimant was treated at the Montgomery Area Mental Health Authority ("MAMHA") beginning in November 2006.  The claimant, who reported having been in prison several times, reported hearing voices, and he was diagnosed with paranoid schizophrenia and prescribed medication. The next treatment

7

record shows the claimant was in prison beginning in August 2008 (Exhibit B6F at 14–24).

The claimant was treated for mental health symptoms while in prison.  In January 2011, the claimant mentioned no mood swings or hallucinations for six months (Exhibit B1F at 33).  The claimant reported that he was "fine" with medication. Hallucinations were in remission, and there were no suicidal or homicidal ideations. The claimant's medications were Cogentin, Trazodone, and Risperdal.  In March 2011, the claimant's impairments were schizoaffective disorder and alcohol and cocaine dependence.  Zoloft was added to the medication, and the claimant appeared calm, fluent, cooperative, and coherent without suicidal ideation (Exhibit B1F at 45–46). The claimant denied depression or anxiety in June 2011.  Plaintiff acknowledged that it took some time to find a combination of medications that worked for him, and he wanted to continue with compliance (Exhibit B1F at 44).

The claimant reported only one mood swing weekly and one hallucination monthly (Exhibit B1F at 32).  The claimant had no complaints in September 2011, with fair appetite and sleep, and no depression or suicidal ideation (Exhibit B1F at 42). Later in the month, the claimant reported doing well, and a mental status examination showed the claimant to be alert, cooperative, and fully oriented, with fair eye contact, insight, and judgment  (Exhibit B1F at 39).  In November 2011, claimant's mood was

improved, as he considered his impending release from prison (Exhibit B1F at 37). The claimant's concern in December 2011 was being able to find a job upon release (Exhibit B1F at 34).

After release from prison in December 2011, the claimant returned to MAMHA for treatment where he was observed to be euthymic and stable on medication.[3]   The claimant's symptoms when not on medication were noted to include delusions, hallucinations, agitation, decreased concentration and ability to think, depressive symptoms in the past, flight of ideas, distractibility, high risk behavior, and manic symptoms in the past.   His diagnosis was schizoaffective disorder (Exhibit B6F at 5–12).

In January 2012, Plaintiff spoke about people being out to get him, and claimant was focused on obtaining disability benefits (Exhibit B6F at 13).   The claimant described profound paranoia, and his dose of Risperdal was increased (Exhibit B6F at 3).  On February 23, 2012, the claimant went to MAMHA, where he sought a doctor's letter in order to enable him to stay longer at the Salvation Army.  The claimant had a subdued mood, but he was described as alert and well oriented with good eye contact,

---

[3] The ALJ's decision incorrectly states that Plaintiff returned to treatment at the MAMHA in December 2012.

AO 72A
(Rev.8/82)

relevant thought content, appropriate speech, and no delusions or hallucinations (Exhibit B12F at 2).

On February 23, 2012, Donald Blanton, Ph.D. ("Dr. Blanton"), performed a psychological consultative examination of the claimant. The claimant complained of stress, anger, and poor esteem for which he received mental health treatment in prison and as an outpatient. He also reported stopping use of cocaine and alcohol six years earlier. During the mental status examination, the claimant avoided eye contact, and he complained of depression and anxiety with low energy. Hallucinations were vaguely described, but he was alert and fully-oriented with limited insight and fair judgment. On the Wechsler Adult Intelligence Scale - Fourth Edition, the claimant attained a full-scale IQ of 48. The score was considered invalid due to lack of effort. Dr. Blanton opined that claimant's "true intellect [was] in the 65-80 IQ range." Dr. Blanton considered the claimant to have schizoaffective type schizophrenia, history of crack cocaine abuse, adjustment disorder due to release from prison and homelessness. Dr. Blanton noted the need to rule out mental retardation and antisocial personality disorder (Exhibit B5F).

MAMHA records show that the claimant had no hallucinations through May 2012. The claimant was maintained on the same medications (Exhibit B12F at 3–4). Plaintiff then moved from Alabama to Atlanta, Georgia.

On September 8, 2012, the claimant went to Grady for a refill of mental health medication.  He showed no obvious signs or symptoms of distress but advised that he was hearing voices because he had been out of medication for one week (Exhibit B9F at 4–5).  Two days later, he returned for mental health assessment, denying any substance abuse history, and he said that he felt that other people were talking about him (Exhibits B9F at 27 and B11F at 8–15).  He returned on October 9, 2012, to report a history of depressed mood, but he currently was "ok."  When he took his medication, he reported no more than intermittent non-threatening hallucinations (Exhibit B11F at 6).  On November 5, 2012, the claimant asked that Golden Barnett, III, M.D. ("Dr. Barnett")[4] complete some disability forms and a clinician was asked to write a letter reminding Mr. Lucas of his diagnosis, his medications, the number of visits, and his next appointment (Exhibit B9F at 32).[5]  The claimant returned to Grady in February

---

[4]  The ALJ's decision inadvertently refers to "Dr. Barnett" as "Dr. Barrett."

[5]  The ALJ's summary of this record entry from the outpatient mental health clinic reads as if Mr. Lucas was asked to complete disability paperwork and write a letter to himself as a reminder of his diagnoses, medications, treatment history, and next appointment.  However, it appears to the undersigned that the reference to "Cl" refers to the clinician rather than the patient or client and that the agency referred to the patient or client as the consumer.  The first two sentences of this treatment note read:

> "Cl [clinician], Jill [] met with Csr [consumer] and he advised that he brought in disability papers for Dr. Barnett to complete.  Jill asked that this Cl [clinician] write a letter for Mr. Lucas advising of his dx, medications, number of visits, and next appointment."

2013, reporting intermittent sedation, which the doctor ascribed to his taking Trazodone nightly, instead of as needed (Exhibit B13F at 13).

In addition to the treatment record, Dr. Barnett, Mr. Lucas's treating psychiatrist at Grady, completed a medical source statement on December 4, 2012, indicating that the claimant could not perform a full-time job since he had schizoaffective disorder, depressed type and cognitive disorder versus borderline intellectual functioning.[6] Dr. Barnett opined that claimant's thought processes were very slow and that he could be easily manipulated.   Due to schizoaffective disorder, Dr. Barnett explained that claimant's observations and decisions could be influenced by psychotic symptoms. In addition, Dr. Barnett opined that claimant's ability to relate to other people and to respond appropriately to others, work pressures, and work changes was markedly limited.   According to Dr. Barnett, claimant's ability to maintain concentration, persistence, and pace, to handle instructions, to respond to customary work pressures, and to perform complex tasks was extremely limited.   Dizziness and drowsiness could be side effects of the claimant's medication; he would be absent four or more days

_____

[R. 520].

[6] The ALJ's decision incorrectly states that Dr. Barnett's medical source statement was dated December 4, 2013.

12

each month; and his condition could deteriorate under the stress of work (Exhibit B10F).

During the November 2013 evidentiary hearing, the vocational expert ("VE") Lane Westcott testified that given the hypothetical RFC presented by the ALJ, the individual claimant would be able to perform the requirements of representative occupations such as hand packer (light, unskilled, DOT # 784.687-042, approximately 4,000 jobs in Georgia and approximately 500,000 jobs in the national economy); garment sorter (light, unskilled, DOT # 222.687-014, approximately 2,100 jobs in Georgia and approximately 429,000 jobs in the national economy); and garment folder (light, unskilled, DOT # 789.687-066, approximately 1,000 jobs in Georgia and approximately 430,000 jobs in the national economy).

## II.    Standard

An individual is considered to be disabled if he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]"  42 U.S.C. § 423(d)(1)(A).   The impairment or impairments must result from anatomical, psychological, or physiological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques and must be of such severity

that the claimant is not only unable to do his previous work but cannot, considering age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  See 42 U.S.C. §§ 423(d)(2) and (3).

"We review the Commissioner's decision to determine if it is supported by substantial evidence and based upon proper legal standards." Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997).  "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."   Id. at 1440.   "Even if the evidence preponderates against the [Commissioner's] factual findings, we must affirm if the decision reached is supported by substantial evidence." Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990). "'We may not decide the facts anew, reweigh the evidence, or substitute our judgment for that of the [Commissioner].'" Phillips v. Barnhart, 357 F.3d 1232, 1240 n.8 (11th Cir. 2004) (quoting Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983)).

"The burden is primarily on the claimant to prove that he is disabled, and therefore entitled to receive Social Security disability benefits." Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001) (citing 20 C.F.R. § 404.1512(a)).   Under the regulations as promulgated by the Commissioner, a five step sequential procedure is followed in order to determine whether a claimant has met the burden of proving his disability.  See Doughty, 245 F.3d at 1278; 20 C.F.R. §§ 404.1520, 416.920.  At step

14

one, the claimant must prove that he has not engaged in substantial gainful activity. See id.  The claimant must establish at step two that he is suffering from a severe impairment or combination of impairments.  See id.  At step three, the Commissioner will determine if the claimant has shown that his impairment or combination of impairments meets or medically equals the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  See Doughty, 245 F.3d at 1278; 20 C.F.R. §§ 404.1520, 416.920.  If the claimant is able to make this showing, he will be considered disabled without consideration of age, education, and work experience.  See id.  "If the claimant cannot prove the existence of a listed impairment, he must prove at step four that his impairment prevents him from performing his past relevant work."  Doughty, 245 F.3d at 1278.  "At the fifth step, the regulations direct the Commissioner to consider the claimant's residual functional capacity, age, education, and past work experience to determine whether the claimant can perform other work besides his past relevant work."  Id.  If, at any step in the sequence, a claimant can be found disabled or not disabled, the sequential evaluation ceases and further inquiry ends.  See 20 C.F.R. §§ 404.1520(a), 416.920(a).

15

AO 72A
(Rev.8/82)

### III.    Findings of the ALJ

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant has not engaged in substantial gainful activity since December 12, 2011, the application date (20 C.F.R. § 416.971 *et seq.*).

2.    The claimant has the following severe impairments: schizoaffective disorder, cognitive disorder, antisocial personality disorder, arthritis, hypertension, and obesity (20 C.F.R. § 416.920(c)).

3.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.920(d), 416.925 and 416.926).

4.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. § 416.967(b), except the claimant can occasionally climb, balance, stoop, crouch, crawl, and kneel.[7]   The claimant must avoid concentrated exposure to hazardous machinery.  The claimant can perform simple tasks of one to three steps, with limited contact with the public, working with things, rather than people.

5.    The claimant has no past relevant work (20 C.F.R. § 416.965).[8]

_____

[7] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time."  20 C.F.R. § 404.1567(b).

[8] The vocational expert testified that the claimant had no past relevant work because the claimant did not engage in activity at a level of substantial gainful activity.

16

6.      The claimant was born on January 29, 1963, and was 48 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 C.F.R. § 416.963).

7.      The claimant has a limited education and is able to communicate in English (20 C.F.R. § 416.964).

8.      Transferability of job skills is not an issue because the claimant does not have past relevant work (20 C.F.R. § 416.968).

9.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. §§ 416.969 and 416.969(a)).

10.     The claimant has not been under a disability, as defined in the Social Security Act, since December 12, 2011, the date the application was filed (20 C.F.R. § 416.920(g)).

[R. 118, 120, 128–29].

IV.     **Discussion**

On appeal, Plaintiff asserts that the Commissioner's decision should be reversed on the following bases: 1) that the ALJ failed to apply the relevant legal standards in weighing evidence to formulate a residual functional capacity ("RFC"); 2) that the ALJ's credibility determination is unsupported by the facts and relevant legal standards; and 3) that the ALJ's finding that there are other jobs Plaintiff can perform

17

is the product of legal error and is unsupported by substantial evidence.   [Doc. 10 at 1, 10, 16, 18].

### A.   The ALJ's RFC Determination Reflects Application Of The Proper Legal Standards And Is Supported By Substantial Evidence

"The residual functional capacity is an assessment, based upon all of the relevant evidence, of a claimant's remaining ability to do work despite his impairments. . . . Along with his age, education and work experience, the claimant's residual functional capacity is considered in determining whether the claimant can work." Lewis, 125 F.3d at 1440 (citing 20 C.F.R. §§ 404.1545(a), 404.1520(f)).  "RFC includes physical abilities, such as sitting, standing or walking, and mental abilities, such as the ability to understand, remember and carry out instructions or to respond appropriately to supervision, coworkers and work pressure." Dempsey v. Comm'r of Social Security, 454 Fed. Appx. 729, 731 n.3 (11th Cir. 2011) (citation omitted).  In determining the claimant's RFC, the ALJ is required to consider the limiting effects of all the claimant's impairments, even those that are not severe. See Phillips, 357 F.3d at 1238 ("[T]he ALJ must determine the claimant's RFC using all relevant medical and other evidence in the case."); and see Jones v. Dept. of Health & Human Servs., 941 F.2d 1529, 1533 (11th Cir. 1991) (citation omitted) ("Where a claimant has alleged several impairments, the Secretary has a duty to consider the impairments in combination and

to determine whether the combined impairments render the claimant disabled."); 20 C.F.R. § 404.1545(e).

**1.    ALJ's Assignment Of Little Weight To Dr. Barnett's Mental RFC Opinion**

Plaintiff contends that the ALJ committed reversible error in assigning only little weight to Dr. Barnett's December 2012 opinion that Mr. Lucas could not sustain full time employment due to his mental impairments. [Doc. 10 at 10–16]. Specifically, Dr. Barnett opined that:

> Mr. Lucas has Schizoaffective disorder, depressed type, and Cognitive disorder versus Borderline Intellectual function.  While Mr. Lucas can make logical decisions, his thought processes are very slow, concrete, and easily manipulated by others.  Due to his schizoaffective illness, his observations and decisions can be influenced by psychotic symptoms of paranoia.

[R. 534].  In addition, Dr. Barnett estimated that Mr. Lucas had "extreme" limitations in his ability to maintain concentration, pace and attention for extended periods of at least 2 hours, his ability to understand, carry out and remember instructions, his ability to respond to customary work pressures, and his ability to perform complex, repetitive, or varied tasks.  [R. 535–36].  Dr. Barnett estimated that Mr. Lucas had "marked" limitations in his ability to relate to other people and respond appropriately to supervision, his ability to respond appropriately to changes in the work setting, and his ability to use good judgment on the job. [R. 535].

19

As an initial matter, because the determination about whether a claimant has met the statutory definition of disability is reserved to the Commissioner, a medical source's opinion that a claimant is disabled is not controlling.  See 20 C.F.R. §§ 404.1527(d), 416.927(d).   However, a treating source's opinion will be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record.  Id.  If the treating source's opinion is not given controlling weight, then the Commissioner is required to apply the following six factors in determining the weight to give the opinion: (1) length of the treatment relationship and the frequency of examination; (2) nature and extent of the treatment relationship; (3) supportability; (4) consistency; (5) specialization; and (6) any other relevant factors. See 20 C.F.R. §§ 404.1527(c), 416.927(c).

The Eleventh Circuit has consistently held that opinions of treating physicians must be accorded substantial or considerable weight by the Commissioner unless good cause exists to discredit these opinions.  See Lewis, 125 F.3d at 1440; Lamb v. Bowen, 847 F.2d 698, 703 (11th Cir. 1988); Walker v. Bowen, 826 F.2d 996, 1000 (11th Cir. 1987); MacGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir. 1986); Broughton v. Heckler, 776 F.2d 960, 961 (11th Cir. 1985).  "Good cause exists 'when the: (1) treating physician's opinion [is] not bolstered by the evidence; (2) evidence supported

AO 72A
(Rev.8/82)

a contrary finding; or (3) treating physician's opinion [is] conclusory or inconsistent with the doctor's own medical records.'" Winschel v. Comm'r of Social Security, 631 F.3d 1176, 1179 (11th Cir. 2011) (quoting Phillips, 357 F.3d at 1241).  An ALJ may disregard a treating physician's opinion with good cause, but his reasons for doing so must be clearly articulated in his decision.  Id.

Here, the ALJ had good cause to reject Dr. Barnett's opinion in that Dr. Barnett's RFC opinion was inconsistent with his own treatment notes and inconsistent with the rest of the record.  [R. 124–25].  See Wind v. Barnhart, 133 Fed. Appx. 684, 691–93 (11th Cir. 2005) (affirming ALJ's decision to not give significant weight to treating psychiatrist's opinion ALJ deemed internally inconsistent and not reconcilable with other evidence).  As the ALJ aptly observed, Dr. Barnett's opinion that Claimant has marked and extreme limitations is contrary to his contemporaneous treatment notes.  Dr. Barnett's December 4, 2012, medication management notes state that Plaintiff advised that:

> "[H]e is doing well with psychiatric symptoms since continuing with his medications uninterrupted.  He reports further decrease in frequency and nature of AH [auditory hallucinations].  He rarely experiences AH [auditory hallucinations] now and they are not command in nature.  He notes that his mood is 'OK.'"

21

[R. 538].   In the same entry, Dr. Barnett indicated that Plaintiff's hygiene and grooming were fair and interaction was good, with pleasant and cooperative behavior. Plaintiff's cognition was in tact, judgment was fair to good, and insight was good. Claimant denied hallucinations, and his thought was logical (Exhibit B11F at 3).  [R. 127, 539].  The ALJ commented on another contradiction between a February 2013, treatment note, in which Dr. Barnett considered Plaintiff to be moderately impaired in multi-step processes (Exhibit B13F at 13), and his medical source statement in which he opines that Plaintiff has extreme difficulties with complex, multi-step instructions. [R. 127].  Significantly, the ALJ noted that treatment records from September 2012 show that "[w]hen he took his medication, [Mr. Lucas] had no more than intermittent non-threatening hallucinations." [R. 125 (citing Exhibit B11F at 6)].  Accordingly, the Court finds that the ALJ had good cause not to credit the treating psychiatrist's RFC opinion.[9]  See Winschel, 631 F.3d at 1179; Leiter v. Comm'r of Social Security Admin., 377 Fed. Appx. 944, 949 (11th Cir. 2010) ("Because the ALJ articulated specific reasons for declining to give the treating physician's opinion controlling

_____

[9] The fact that Dr. Barnett, a psychiatrist, is a specialist pursuant to 20 C.F.R. § 416.927(d)(5), is only one of several factors the ALJ is to consider in evaluating the weight to attribute his opinion and, therefore, does not undermine the ALJ's determination.  See 20 C.F.R. § 416.927(d)(5) (opinions of specialists rendered in area of expertise are generally given more weight than opinions of non-specialists).

weight, and these findings were supported by substantial evidence in the record, we hold that the ALJ had good cause to reject this opinion."); Moore v. Barnhart, 405 F.3d 1208, 1212 (11th Cir. 2005) ("Where our limited review precludes re-weighing the evidence anew . . . , and as the ALJ articulated specific reasons for failing to give [the treating source's] opinion controlling weight, we find no reversible error.") (internal citation omitted).

Moreover, the undersigned considers the ALJ's comment that Dr. Barnett's RFC opinion and medical source statement may have been influenced by sympathy, emotion, or the treatment relationship with Claimant as gratuitous.[10] See Sutterfield ex rel. D.I.S., 2015 WL 4773873, at *5 & n.4 (N.D. Ala. August 13, 2015) (similar remark by ALJ deemed gratuitous and unrelated to the ALJ's evaluation of the treating physician's opinion and rationale for assigning little weight); and see Kelly v. Comm'r of Social Security, 401 Fed. Appx. 403, 404–05 & n.6 (11th Cir. 2010) (affirming denial of benefits and holding that while ALJ questioned possibility of medical

---

[10] The ALJ stated that, "The possibility always exists that a doctor may express an opinion in an effort to assist a patient with whom he or she sympathizes for one reason or another, such as his employer having a policy to submit opinions that could result in reimbursement of the hospital upon a finding of disability." [R. 127]. The Court construes this as an attempt by the ALJ to understand and explain the inconsistencies between Dr. Barnett's RFC opinion and the rest of the record evidence.

23

source's opinion being influenced by sympathy for claimant, ALJ's ruling explained appropriate reasons for discounting opinion such as lack of support in the record and inconsistencies).  Here, like Kelly, the ALJ identified inconsistencies between Dr. Barnett's opinion and the rest of the medical evidence as well as contradictions between Dr. Barnett's RFC opinion and his treatment notes.  [R. 126].  Because the ALJ considered Dr. Barnett's RFC opinion lacking support in the record, speculation that Dr. Barnett might have been sympathetic to Claimant does not appear to have had any bearing upon the ALJ's evaluation of the evidence.

Finally, in assigning little weight to Dr. Barnett's mental RFC opinion, the ALJ did not "play doctor and make [his] own independent medical findings."  [Doc. 10 at 15–16 (quoting Haag v. Barnhart, 333 F. Supp. 2d 1210, 1220 (N.D. Ala. 2004))].  Plaintiff questions the ALJ's statement that, "the undersigned does not rely on these [state agency] opinions, but independently evaluates the record."  [Doc. 10 at 12].  Read in context, the ALJ is referring to the *non-examining* state agency consultants and their opinions.[11]   The ALJ did not reject all opinion evidence from state agency

---

[11] The ALJ explained that:

As for the opinion evidence, consideration has been given the reports of the State Agency *non-examining* medical consultants.  As required by Social Security Rulings (SSR) 98-5p and 96-2p, the opinions provided by

consultants (i.e., Dr. Blanton).  In conclusion, in attempting to synthesize conflicting

medical evidence, the ALJ simply did his job.  See Wind, 133 Fed. Appx. at 691

(recognizing that the ALJ, as fact finder, is in the best position to choose between

conflicting evidence) (citations omitted).

The Court therefore finds that substantial evidence supports the ALJ's

assignment of little weight to Dr. Barnett's opinion as to Claimant's functional

capacity.

_____

the State Agency consultants have been carefully considered. The
regulatory factors for evaluating medical source statements indicates that
the fact that the consultants are not examining physicians or
psychologists must be taken into account (20 C.F.R. §§ 404.1527 and 20
C.F.R. §§ 416.927).  Even though the opinions of the State Agency
*non-examining* medical consultants are well-reasoned, supported by the
medical evidence of record as a whole, and substantively consistent with
the other opinions, the undersigned does not rely on these opinions, but
independently evaluates the record.

[R. 128 (emphases provided)].

25

**2.      The ALJ Applied The Proper Legal Standards In Evaluating Plaintiff's Mental RFC**

Although Plaintiff does not use the phrase, "function-by-function assessment," Plaintiff next argues that the ALJ erred in the RFC assessment by failing to speak directly to certain of the work-related mental abilities.  [Doc. 10 at 10].  Plaintiff contends that the ALJ did not account for or make findings as to all of his mental or non-exertional limitations, namely, Plaintiff's abilities to: "use judgment in making work-related decisions; respond appropriately to supervision, co-workers and work situations; and deal with changes in a routine work setting."[12] [Doc. 10 at 11].

Social Security Ruling 96-8p provides, "The RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis. . . ."  With regard to non-exertional capacity, SSR 96-8p gives examples of work-related functions that must be considered when assessing RFC for an individual with mental impairments and impairments affecting vision, hearing, or speech.  Id.  For example, the Ruling states, "Work-related mental

---

[12] A nonexertional impairment is "[a]ny impairment which does not directly affect the ability to sit, stand, walk, lift, carry, push, or pull.  This includes impairments which affect the mind, vision, hearing, speech, and use of the body to climb, balance, stoop, kneel, crouch, crawl, reach, handle, and use of the fingers for fine activities."  SSR 83-10.

26

activities generally required by competitive, remunerative work include the abilities to: understand, carry out, and remember instructions; use judgment in making work-related decisions; respond appropriately to supervision, co-workers and work situations; and deal with changes in a routine work setting."  SSR 96-8p.

Similarly, Social Security Ruling 85-15, which governs the evaluation of mental impairments not of listing severity, adds that, "[a] *substantial loss* of ability to meet any of these basic work-related activities would severely limit the potential occupational base . . . [and] in turn, would justify a finding of disability because even favorable age, education, or work experience will not offset such a severely limited occupational base."  SSR 85-15, 1985 WL 56857 (January 1, 1985) (emphasis added).

In this case, the ALJ did not find evidence of substantial loss as to any of these basic work-related activities despite Plaintiff's mental impairments in light of the ample record evidence indicating that Claimant's mental impairments are successfully managed as long as Claimant is medication-compliant.[13]  [R. 126].  In fact, the ALJ

---

[13] Plaintiff does not contend that the ALJ failed to consider all severe and non-severe mental impairments in formulating RFC.  The ALJ stated that the medical evidence of record shows that Claimant has been diagnosed with schizoaffective disorder and that he has also been dependent on cocaine; then, the ALJ also mentioned that other diagnoses included cognitive disorder, depression, anxiety, antisocial personality disorder, and schizophrenia.  [R. 125].

27

noted that when Claimant was seen by medical personnel outside of the mental health setting, his schizoaffective disorder was often not immediately apparent.[14]  [R. 126]. Given Plaintiff's demonstrated ability to control symptoms with medication, the ALJ found that Claimant's mental impairments "do not require much accommodation." [R. 127].

In fashioning the mental RFC, the ALJ nonetheless took into account Claimant's medications and side effects.   [R. 127–28].  Claimant testified that he experienced dizziness and lack of focus at times. [R. 140].  The ALJ's RFC noted these complaints and included the restriction that claimant "avoid concentrated exposure to hazardous machinery" plus limited Plaintiff to "simple tasks of one to three steps." [R. 120].  The ALJ further noted that he was allowing for "non-detailed tasks" in the RFC and that, in case Plaintiff "is distracted by a hallucination or an episode of depression or anxiety, or if his medication makes him less alert, he can proceed with tasks that are routine and do not demand much thought." [R. 127].

The ALJ also took into account Claimant's social functioning and ability to interact with other people in a work environment by restricting Claimant to "limited

---

[14]  The ALJ wrote, "When the claimant was observed by other medical professionals, typically no significant mental problem was observable." [R. 126].

contact with the public, working with things, rather than people." [R. 120, 127–28]. The ALJ asked the VE to identify jobs available "with very limited contact with the public." [R. 150]. In addition, the ALJ explained that:

> [O]ur hypothetical person really needs to be working with things . . . and even ideally, where he didn't have to depend on coworkers. In other words I mean kind of a team situation. Just they sit down and do their job, and go home.

[R. 150]. The ALJ's RFC implicitly encompassed Claimant's ability to interact with supervisors and/or ability to respond to supervision.[15]

---

[15] The ALJ's RFC finding as to moderate limitation in social functioning is bolstered by the step three listing analysis below:

> In social functioning, the claimant has moderate difficulties. In treatment notes, the claimant is described as pleasant with cooperative behavior and good interactions. In a function report, the claimant stated that he had no problems getting along with family, friends, neighbors, or others. He attends church with his sister (Exhibit B5E). He is able to tolerate interactions with many people at the shelter where he lives. With these findings and activities, the claimant has no more than moderate difficulties in social functioning.

[R. 119]. See, e.g., Wind, 133 Fed. Appx. at 694 (ALJ's description of claimant's "moderate" mental limitations as "limited but satisfactory" and "mild to moderate" did not mis-characterize the degree of limitation where the source the ALJ relied upon defined "moderate restrictions" as "'an impairment which affects but does not preclude the ability to function.'").

29

The Court finds that the ALJ's RFC adequately addresses Plaintiff's mental impairments and is supported by substantial evidence.

**B.     The ALJ's Credibility Determination Comports With Proper Legal Standards And Is Supported by Substantial Evidence**

The Court also finds that the ALJ's credibility determination comports with proper legal standards and is supported by substantial evidence.   When a claimant seeks to establish disability through subjective testimony concerning pain or other symptoms, a "pain standard" established by the Eleventh Circuit applies.  Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991); see also Crow v. Comm'r, Social Security Admin., 571 Fed. Appx. 802, 807 (11th Cir. 2014) ("The 'pain standard' is applicable to other subjective symptoms as well.") (citing Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005)).  The claimant can satisfy this standard by showing: "(1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain."  Wilson v. Barnhart, 284 F.3d 1219, 1225 (11th Cir. 2002) (citing Holt, 921 F.2d at 1223).

AO 72A
(Rev.8/82)

Where a claimant's testimony, if credited, could support the claimant's disability, the ALJ must make and explain a finding concerning the credibility of the claimant's testimony.  See Viehman v. Schweiker, 679 F.2d 223, 227–28 (11th Cir. 1982).  "If the ALJ discredits subjective testimony, he must articulate explicit and adequate reasons for doing so."  Wilson, 284 F.3d at 1225 (citing Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987)).  The ALJ's evaluation of a claimant's subjective symptoms should be guided by the following relevant factors: (1) daily activities; (2) location, duration, frequency, and intensity of the claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication the claimant takes to alleviate his symptoms; (5) treatment received and measures used, other than medication, for the relief of symptoms; and (6) any other factors concerning the functional limitations and restrictions due to the claimant's symptoms.  See 20 C.F.R. §§ 404.1529, 416.929; SSR 96-7p.  "A clearly articulated credibility finding with substantial supporting evidence in the record will not be disturbed by a reviewing court."  Foote, 67 F.3d at 1562 (citing MacGregor, 786 F.2d at 1054).

In this case, the ALJ found that while the "claimant's medically determinable impairments could reasonably be expected to cause some symptoms . . ., the claimant's

31

statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible . . . ." [R. 127].  In support of this finding, the ALJ looked to the conservative treatment record for both Plaintiff's physical and mental impairments. For instance, regarding Plaintiff's arthritis, the ALJ noted that the objective medical evidence of record such as an  x-ray of Plaintiff's lumbar spine from November 2012 "reflected no acute fracture, misalignment, or dislocation, with minimal endplate osteophytes" (Exhibit B9F at 43). [R. 123].  Similarly, imaging did not reveal "any nerve root compression, which would be related to the most serious spinal pain, and [] is inconsistent with the level of pain the [Claimant] complains of having." [R. 123]. In addition, the treatment record as a whole, which did not include any recommended braces, epidural steroid injections, or surgery to address his back pain [R. 123] was inconsistent with Claimant's testimony [R. 141] that his daily back pain rates a seven or eight on a scale of one to ten (with ten being the most painful). [R. 141].  The ALJ did not find Claimant's testimony that he is forced to lie down most of the day with his legs elevated and pulled towards his chest credible given Claimant's testimony [R. 142] that he goes to Park Place (mental health treatment facility) every day for assistance from the counselors there.  [R. 142].  The ALJ also pointed to Claimant's

AO 72A
(Rev.8/82)

testimony that he requires use of his cane every day and noted that multiple physical examinations indicate that Plaintiff had a normal gait.  [R. 123, 139].

As for Claimant's credibility concerning the impact of his mental impairments, the ALJ pointed out that Claimant had not required hospitalization during the relevant time period due to the effective management of symptoms (including psychosis and paranoia) with medication. [R. 126].  Claimant admitted that, although he was hospitalized at least twice due to suicidal ideations associated with his schizophrenia, he had not required inpatient hospitalization since that time due to his treatment with medication.[16] [R. 142–43].  In addition, in June 2011, Claimant acknowledged while being treated in prison that, although it took time to achieve such a positive result, his prescribed medication regimen was, in fact, effective – so much so that Plaintiff wanted to remain compliant. [R. 422 ("I need my medication. It take [took] a long time to find a combination of medications that work for me.  Please do not stop.")].

---

[16] Claimant was questioned as follows and testified:

Q:    Okay, so how many times have you ever wanted to kill yourself?
A:    Quite a few times before they got me on my medication.
Q:    Okay, do you ever still even after your medication, do you ever want to kill yourself?
A:    No.

[R. 143].

33

Plaintiff's complaints about the side effects of his medication also appear to be exaggerated.  In the Adult Function Report (Exhibit B5E) Plaintiff was asked to complete in January 2012, Claimant represented that his medications make him so dizzy and drowsy that he is unable to do much of anything but sleep and that he lacks the energy to cook meals and manage his personal care (comb hair, shave) and hygiene independently.  [R. 344–45].  On the same form, when asked about his daily activities, Plaintiff stated, "I get up and use the bathroom, get me something to eat and get back in the bed."  [R. 343].  The ALJ pointed also to Plaintiff's purported "lack of effort" during the consultative examination with Dr. Blanton [R. 127] and observed instances documented in the record of Claimant trying to appear to be more limited than he actually is. [R. 123].  At least one treatment provider noted that Claimant was primarily motivated by (or focused on) his desire to obtain disability insurance benefits.  [R. 459].

In sum, the ALJ's credibility determination is supported by substantial evidence.

C.     **Substantial Evidence Supports The ALJ's Finding At Step Five That Despite Plaintiff's RFC, Age, Education, And Past Work Experience, Plaintiff Can Perform Other Work**

Claimant's final argument on appeal is that the ALJ committed reversible error by failing to include or otherwise account for all of Claimant's impairments within the

34

hypothetical questions posed to the VE.  Relying on the premise that the hypothetical and VE testimony did not fully assume all of Claimant's limitations, Claimant contends that the ALJ's reliance on the VE testimony does not constitute substantial evidence.  See, e.g., Brenem v. Harris, 621 F.2d 688, 690 (5th Cir. 1980).[17]

As discussed *supra*, the burden shifted to the Commissioner at the fifth step to show that Plaintiff is able to perform other work that exists in significant numbers in the national economy.  See Cowart v. Schweiker, 662 F.2d 731, 736 (11th Cir. 1981) ("[O]nce the claimant establishes a prima facie case by showing that her impairment

---

[17]   On November 3, 1981, the newly constituted Eleventh Circuit Court of Appeals held that decisions of the Fifth Circuit issued prior to and through September 30, 1981, "shall be binding as precedent" on all federal courts within the Eleventh Circuit.  See Bonner v. City of Prichard, Ala., 661 F.2d 1206, 1207 (11th Cir. 1981).

The Brenem v. Harris decision, cited by Plaintiff, is factually distinguishable. See Brenem, 621 F.2d at 689–90.  In Brenem, the Fifth Circuit found reversible error and remanded to the Commissioner for further proceedings because the hypothetical presented, and subsequent VE testimony, only addressed physical impairments despite the finding by the ALJ that claimant, in fact, suffered from both mental and physical impairments.  Id.  The magistrate judge and district court had relied upon the fact that medical records included "ample reference to the psychological aspects of Plaintiff's physical impairment."  Id. at 690.  The Fifth Circuit explained that it would not be proper to *assume* that, because the VE was aware of the psychological problems referenced throughout the medical records the VE is tasked with reviewing, that the VE actually took the mental impairments into consideration when not incorporated into the ALJ's hypothetical questions.  Id.  That is not the issue here as varying levels of impairment and varying degrees of limitation for both physical and mental impairments were contemplated by the ALJ's hypothetical scenarios to the VE. [R. 150–53].

35

prevents her from performing her prior occupation, the burden shifts to the Secretary, who must produce evidence to show that the claimant is able to perform alternative substantial gainful work that exists in the national economy."). "To meet this burden, it is incumbent on the [Commissioner] at a minimum, to come forward with specific findings showing that the claimant has the physical and mental capacity to perform specified jobs." Id. (citations, quotation marks, and alterations omitted).

"There are two avenues by which the ALJ may determine whether a claimant has the ability to adjust to other work in the national economy: (i) by applying the 20 C.F.R. Part 404 Medical-Vocational Guidelines (the 'Grids'); and (ii) by the use of a VE, an expert on the kinds of jobs an individual can perform based on [her] capacity and impairments." Owens v. Comm'r of Social Security, 508 Fed. Appx. 881, 883 (11th Cir. 2013) (citing Phillips, 357 F.3d at 1239–40). "If nonexertional impairments exist, the ALJ may use the Grids as a framework to evaluate vocational factors, but must also introduce independent evidence, preferably through VE testimony, of the existence of jobs in the national economy that the claimant can perform." Owens, 508 Fed. Appx. at 883–84 (citing, e.g., Marbury v. Sullivan, 957 F.2d 837, 839 (11th Cir. 1992)). "In order for a vocational expert's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's

36

impairments." <u>Wilson</u>, 284 F.3d at 1227 (citing <u>Jones v. Apfel</u>, 190 F.3d 1224, 1229

(11th Cir. 1999)); <u>accord</u> <u>Ingram v. Comm'r of Social Security Admin.</u>, 496 F.3d 1253,

1270 (11th Cir. 2007) (applying <u>Wilson</u>).

The Court finds that in the present case, the ALJ met his burden. The ALJ not

only used the grids as a framework to conclude that a finding of "not disabled" was

appropriate, but he introduced independent evidence in the form of testimony from a

VE to establish that Claimant is capable of performing representative occupations such

as hand packer, garment sorter, and garment folder. [R. 129].  According to Plaintiff,

the ALJ committed error by failing to incorporate the limitations Dr. Barnett identified

within his medical source statement – contained in the third hypothetical from the ALJ

– which would have resulted in the preclusion of all work.[18]  [R. 151–52].  When

soliciting expert opinion testimony from the VE, the ALJ was extremely thorough and

posed several hypotheticals to the VE representing various degrees of limitation.  [R.

150–52].   The ALJ's first hypothetical question was expressed as follows:

> Please assume, a hypothetical person of claimant's age, education, with
> no past relevant work, and further assume the following limitations that
> our first hypothetical person would be limited to a light exertional level,

_____

[18] This argument is merely a restatement of Claimant's previous arguments that
the ALJ erred in failing to credit and adopt Dr. Barnett's medical source statement in
full and improperly evaluated Claimant's credibility.

> with climbing, balancing, stooping, kneeling, crouching, and crawling all
> limited to occasionally, but need to avoid concentrated exposure to
> hazardous machinery, and let's limit our hypothetical person to
> understanding, remembering, and carryout simple one, two, three-step
> tasks, with very limited contact with the public.

[R. 150].   The ALJ elaborated further and emphasized that:

> [O]ur hypothetical person really needs to be working with things . . . and
> even ideally, where he didn't have to depend on coworkers.  In other
> words I mean kind of a team situation.  Just they sit down and do their
> job, and go home.

[R. 150].  The ALJ's second hypothetical asked the VE to consider the availability of

jobs that could accommodate identical non-exertional limitations with the lower

exertional level of sedentary work.  [R. 151].  In the third hypothetical question,

modeled after Dr. Barnett's mental RFC opinion, the ALJ asked the VE to consider the

same hypothetical person as described in the first two questions but add "a marked

degree of symptomology on the mental in two main areas, social interaction and

concentration, persistence, and pace . . . with marked problems in the ability to

complete a normal workday and workweek without interruptions from psychologically

based symptoms, such that [the] hypothetical person couldn't sustain even simple, one,

two, three-step tasks on a routine basis."   [R. 151].  The VE testified that these

limitations would rule out all prior occupations provided and preclude all work in the

38

competitive labor market.[19]  [R. 151–52].  The ALJ ultimately found and relied upon moderate (as opposed to marked or extreme) restrictions with respect to Claimant's mental impairments.[20]  Accordingly, the limitations counsel contends were not presented or included in the hypothetical (and VE testimony in response to the same) are limitations the ALJ rejected for the reasons previously discussed.  See Crawford v. Comm'r of Social Security, 363 F.3d 1155, 1161 (11th Cir. 2004) ("[T]he ALJ was not required to include findings in the hypothetical that the ALJ had properly rejected as unsupported.").  The ALJ applied the proper legal standards when he elicited testimony from the VE at the administrative hearing.

Finally, to the extent that Plaintiff suggests that the ALJ erred in failing to explicitly include within a hypothetical to the VE that Claimant has a moderate

---

[19]  The VE was also asked to consider the effect on available jobs if the hypothetical person experienced "moderately severe to sometimes a severe level of pain" and the effect on the hypothetical person if forced "to elevate their legs for pain purposes above the chest level" for approximately half of the workday.  [R. 152–53].  In all of these instances, all competitive work would have been precluded.  [R. 152–53].

[20]  A comparison of the first two hypotheticals posed by the ALJ with the third hypothetical that explicitly asked the VE to include "a marked degree of symptomology on the mental in the two main areas, social interaction and concentration, persistence, and pace" indicates that the ALJ's first two hypotheticals contemplated moderate limitation of function in these areas.

AO 72A
(Rev.8/82)

limitation with respect to his ability to maintain concentration, persistence, and pace, the Court is persuaded that any such error would be harmless on this record. See, e.g., Winschel, 631 F.3d at 1180.   In Winschel, the Eleventh Circuit held, as a matter of first impression, that a hypothetical question to a VE must specifically account for limitations in concentration, persistence, and pace identified during the Psychiatric Review Technique ("PRT") for purposes of steps two and three of the sequential evaluation process.   Id. at 1180–81 (applying Wilson and finding reversible error where the ALJ asked the vocational expert a hypothetical question that failed to include or otherwise implicitly account for all of Winschel's impairments).   The Eleventh Circuit highlighted the fact that "the ALJ did not indicate that medical evidence suggested Winschel's ability to work was unaffected by this limitation, nor did he otherwise implicitly account for the limitation in the hypothetical." Id. at 1181; and see Scott v. Comm'r of Social Security, 495 Fed. Appx. 27, 28–29 (11th Cir. 2012) (hypothetical adequately accounted for moderate limitation in ability to maintain concentration, persistence, and pace where ALJ asked VE to include work that would require "low stress, simple, unskilled; one, two, or three step instructions . . . [and] specifically noted in the hypothetical that the person had 'psychological based symptoms which affect[ed] his ability to concentrate upon complex or detailed tasks;

40

but would remain capable of carrying out simple job instructions'"). Unlike the facts of <u>Winschel</u>, the <u>Scott</u> panel found no reversible error in that, by way of determining mental RFC, the ALJ "clearly indicated that medical evidence showed that Scott could complete simple tasks on a regular basis." 495 Fed. Appx. at 29.

The same is true in the instant case. As discussed, *supra*, the ALJ implicitly incorporated a moderate limitation as to concentration, persistence, and pace into the first two hypotheticals by asking the VE to factor in "understanding, remembering, and carry [ing] out simple one, two, three-step tasks, with very limited contact with the public." [R. 150]. <u>See</u> <u>Winschel</u>, 631 F.3d at 1180–81 (recognizing that "other circuits have held that hypothetical questions adequately account for a claimant's limitations in concentration, persistence, and pace when the questions otherwise implicitly account for these limitations"). Relying on substantial record evidence, the ALJ determined that "[C]laimant's mental impairments, adequately controlled when compliant with medication, do not require much accommodation." [R. 127]. For all of the reasons set forth herein, the Court concludes that the ALJ did not err when he relied on the VE's testimony and concluded that Claimant is capable of performing other work. The testimony of the VE satisfies the Commissioner's burden at step five. [R. 148–53].

41

Accordingly, substantial evidence supports the ALJ's findings at step five that notwithstanding Plaintiff's RFC, age, education, and past work experience, Plaintiff is capable of performing other work and is, therefore, not disabled.

## V.   Conclusion

Based on the forgoing reasons and cited authority, the Court finds that the decision of the ALJ was supported by substantial evidence and was the result of an application of proper legal standards.   It is, therefore, **ORDERED** that the Commissioner's decision be **AFFIRMED**.   The Clerk is **DIRECTED** to enter judgment in favor of the Commissioner.

**SO ORDERED THIS** 16th day of September, 2016.

JANET F. KING
UNITED STATES MAGISTRATE JUDGE

42